UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

JAMES B. HURLEY and BRANDI HURLEY,

      Plaintiffs,

and

JAMES B. HURLEY,

      Counter-Defendant,

v.

DEUTSCHE BANK TRUST COMPANY
AMERICAS f/k/a Banker's Trust Company,
as Trustee and Custodian by: SAXON
MORTGAGE SERVICES, INC., f/k/a/
Meritech Mortgage Services, Inc.,

      Defendants/Counter-Plaintiffs,

and

DAVID C. LOHR and ORLANS
ASSOCIATES, P.C.,

      Defendants.
_____/

Case No. 1:08-CV-361

HON. GORDON J. QUIST

## **OPINION**

On August 12, 2010, the Court entered an order: (1) directing Plaintiffs to disclose their

evidence relating to punitive damages by August 27, 2010, and Defendants to disclose such evidence

by September 13, 2010; (2) granting Defendants until September 13, 2010, "to file any motion to

strike regarding punitive damages"; and (3) setting a briefing schedule if Defendants elected to file

motions to strike. Pursuant to the August 12, 2010, Order, the parties have filed their evidentiary

submissions regarding punitive damages.[1] In addition, Defendants Deutsche Bank Trust Company

---

[1] Plaintiff James Hurley filed a submission regarding punitive damages, and Plaintiff Brandi Hurley filed a
concurrence in that submission.

Americas and Saxon Mortgage Services, Inc. (collectively "Deutsche Bank") have filed a Motion to Strike Plaintiffs' Claim for Punitive Damages, and Defendants David C. Lohr and Orlans Associates, PC (collectively "Orlans") have filed a Motion for Partial Summary Judgment. Orlans has also filed a Motion to Amend and Correct Prior Pleadings, seeking to correct a misstatement in its Motion for Partial Summary Judgment. Finally, Plaintiff James Hurley has filed a Motion to Strike and for Sanctions in response to Orlans' Motion for Partial Summary Judgment.

For the reasons set forth below, the Court will deny Deutsche Bank's Motion to Strike; grant Orlans' Motion for Partial Summary Judgment and Motion to Amend; and deny Plaintiff James Hurley's Motion to Strike and for Sanctions. In addition, the Court concludes that Plaintiffs' evidence is insufficient to support a claim for punitive damages against either Orlans or Deutsche Bank.

## I. Procedural History

Before addressing the instant motions, it is necessary to review the procedural history of this case to provide the background relevant to some of its rulings. The essential facts giving rise to the underlying dispute have been included in the Court's prior opinions and will be repeated here only as necessary to the Court's analysis.

Plaintiffs filed their complaint on May 2, 2007, in the Eastern District of Michigan alleging claims for violation of the Servicemembers' Civil Relief Act ("SCRA"), 50 U.S.C. App. § 501, *et seq.*; negligent infliction of emotional distress; intentional infliction of emotional distress; fraud; and conversion. On December 10, 2007, after Plaintiffs amended their complaint, Orlans filed, and Deutsche Bank concurred in, a motion to dismiss and for partial summary judgment, seeking dismissal of all claims except the SCRA claim by James Hurley. Defendants nonetheless argued that Brandi Hurley's SCRA claim should be dismissed because the amended complaint failed to allege that she incurred damages under the SCRA. Defendants did not argue that James Hurley's

2

SCRA claim failed as a matter of law or was otherwise subject to dismissal. On February 12, 2008, the Honorable Nancy G. Edmunds entered an order granting Defendants' motion in part and denying it in part. Judge Edmunds agreed with Defendants that Brandi Hurley's SCRA claim was subject to dismissal because the complaint failed to allege that Brandi Hurley suffered damages under the SCRA, but she allowed Plaintiffs to amend to cure that pleading defect. Plaintiffs subsequently filed a two-count second amended complaint alleging claims for violation of the SCRA and conversion.

On April 17, 2008, Judge Edmunds granted Deutsche Bank's motion to transfer venue and transferred the case to this district. Following the transfer, the case was assigned to the undersigned, and Defendants filed motions for summary judgment. In its motion, Orlans raised several arguments regarding the SCRA claim, including, that: (1) Plaintiffs failed to pursue their remedies in state court under § 521(g) of the SCRA; (2) there is no express or implied right of action for violations of the SCRA; (3) any damages available under the SCRA are limited to damages for conversion; and (4) the SCRA does not authorize punitive damages. Deutsche Bank, too, raised several arguments regarding the SCRA claim, including, that: (1) James Hurley was not entitled to the protections of the SCRA because he failed to provide his active duty orders to Deutsche Bank; (2) James Hurley was not protected by the SCRA until his active duty began on October 25, 2004; (3) there is no implied private right of action under the SCRA; and (4) punitive damages are not available under the SCRA.

On September 30, 2008, the Court issued an Opinion and Order addressing Defendants' motions for summary judgment and Plaintiffs' motion for summary judgment. The Court granted Defendants' motions with regard to the SCRA claim but denied them with regard to the conversion claim. Regarding the SCRA claim, the Court concluded that there is no implied right of action for the alleged SCRA violations. Subsequently, the Court denied Plaintiffs' motion for reconsideration. In an Opinion issued on March 13, 2009, however, the Court reconsidered its September 30, 2008,

decision and held that the SCRA does create an implied private right of action. In light of that holding, the Court reached the following additional conclusions relative to the SCRA claim: (1) James Hurley was entitled to SCRA protections as of September 11, 2004, when he received his unit orders; (2) Defendants violated Sections 533(c) and 526(c) of the SCRA, which preclude nonjudicial foreclosures and require tolling of the redemption period during a period of military service, but Defendants did not violate Sections 531 and 521(h), relating to evictions and acquisitions by bona fide purchasers; (3) Plaintiffs' failure to pursue their remedies under § 521(g) does not preclude their SCRA claim; (4) the SCRA claim was barred neither by the *Rooker-Feldman* doctrine nor by laches; and (5) punitive damages are allowed under the SCRA.

On April 3, 2009, Deutsche Bank moved for reconsideration of the March 13, 2009, Opinion or, in the alternative, for certification for interlocutory appeal. Deutsche Bank reargued the availability of punitive damages under the SCRA and raised, for the first time, the statute of limitations for that claim. The Court denied the motion on April 21, 2009. After almost two years of litigation, and except for an outstanding discovery dispute regarding punitive damages, the case appeared ready for trial. Then, on May 21, 2009, Orlans' new counsel of record filed a motion to compel arbitration, in which Deutsche Bank concurred. The Court denied Orlans' motion on June 23, 2009, concluding that Defendants had waived any right to arbitrate through their litigation conduct.[2] Orlans then took an interlocutory appeal to the Sixth Circuit, which affirmed this Court in an opinion and judgment entered on July 1, 2010.

Following the issuance of the mandate, the Court held a status conference, at which the Court and the parties discussed discovery issues, specifically those relating to punitive damages, and trial. As a result of this status conference, the Court issued the August 12, 2010, Order, from which the instant motions arise.

_____

[2]The Court also stayed the case pending the parties' efforts to resolve the case through facilitative mediation.

## II. DISCUSSION

### A.     Defendants' Motions

### *If at First You Don't Succeed, Try, Try Again*

While this motto is often laudable, and second efforts can be both heroic and inspirational, there are limits.  As the Seventh Circuit has observed, "it is ill-suited as a principle for case management." *United States v. Smith*, 562 F.3d 866, 871 (7th Cir. 2009).  Nonetheless, this has been Defendants' litigation history in this case.  Defendants have had several opportunities to raise their arguments regarding punitive damages and other SCRA issues, and they have done so.  Now, armed with new counsel and fresh perspective, they have taken yet another shot at previously decided issues.  Thus, in addition to addressing whether there is sufficient evidence to support a punitive damages award against it, Orlans argues that a punitive damages award would violate its due process rights.  Deutsche Bank goes even further, raising five arguments in its motion to strike (including the same due process argument raised by Orlans), none of which has anything to do with the sufficiency of punitive damages evidence, and two of them (loss causation and Brandi Hurley's standing under the SCRA) are not even limited to punitive damages.[3]

The March 13, 2009, Opinion established the law of the case regarding punitive damages under the SCRA: such damages are available if warranted by the evidence.[4]  The August 12, 2010, Order was not an invitation to file motions for reconsideration on punitive damages or any other

---

[3] In its March 13, 2009, Opinion, the Court indicated that Deutsche Bank's proffered evidence that James Hurley had the ability to make his mortgage payment but elected to stop making payments on the property several months before the foreclosure might be relevant to the issue of damages.  Deutsche Bank's cause-in-fact and proximate cause argument (which pertains to all types of damages) essentially makes this point.  Because this argument was not presented in a timely-filed motion for summary judgment, however, the Court will not consider it now.  Deutsche Bank may present such evidence at trial.

[4] Title III, Section 303 of the recently enacted Veterans Benefits Act of 2010, Publ L. No. 111-275, 124 Stat. 2864, amends the SCRA by adding Section 802 – a provision creating a private right of action for "[a]ny person aggrieved by a violation of [the SCRA]."  124 Stat. 2877.  An aggrieved person may "recover all [] appropriate relief, including monetary damages."  Because the Court has concluded that an implied right of action exists under the SCRA and punitive damages are available in such actions, the Court need not consider whether recently-enacted Section 802 applies retroactively to Defendants' conduct.

issue or to reopen dispositive motion practice in general; that time has passed. Pursuant to the June 20, 2008, Amended Case Management Order, the deadline for dispositive motions, which has never been extended, was June 16, 2008. True, paragraph C. of the August 12, 2010, Order does permit Defendants "to file any motion to strike regarding punitive damages," and that language could arguably be read to allow Defendants to raise *any* argument that would preclude punitive damages. But, when read in conjunction with paragraph B.– which directs the parties to disclose their punitive damages evidence to the Court and each other – the scope of such motions was limited to whether there is enough evidence to submit punitive damages to the jury. If not, Plaintiffs' discovery requests for punitive damages evidence from Defendants would be moot. Thus, the Court's analysis in this Opinion is limited to: (1) identifying the proper standard for punitive damages; and (2) determining whether the evidence meets that standard. At the same time, the Court has not, as Plaintiffs suggest, already ruled that the issue of punitive damages is for the jury in this case. To the contrary, the Court merely ruled that punitive damages are available as a remedy should the facts so warrant.

For these reasons, the Court will deny Deutsche Bank's Motion To Strike in its entirety and will not consider Orlans' due process argument in its Motion For Partial Summary Judgment.

### 1. Sufficiency of Punitive Damages Evidence

While neither the parties nor this Court has been able to find case law regarding the correct standard for punitive damages under the SCRA, the Court has previously indicated that it generally refers to Federal Jury Practice and Instructions for non-standard instructions. The Court believes that the following punitive damages instruction from that source correctly states federal law on punitive damages. The instruction provides, in pertinent part:

> In addition to actual damages, the law permits a jury, under certain circumstances, to award the injured person punitive and exemplary damages in order to punish the wrongdoer for some extraordinary misconduct and to serve as an example or warning to others not to engage in such conduct.

> If you find from a preponderance of the evidence that . . . the act or omission of [the] defendant . . . was maliciously, or wantonly, or oppressively done, then you may add to the award of actual damages such amount as you shall unanimously agree to be proper as punitive and exemplary damages.
>
> An act or a failure to act is "maliciously" done, if prompted or accompanied by ill will, or spite, or grudge, either toward the injured person individually, or toward all persons in one or more groups or categories of which the injured person is a member.
>
> An act or a failure to act is "wantonly" done, if done in reckless or callous disregard of, or indifference to, the rights of one or more persons, including the injured person.
>
> An act or a failure to act is "oppressively" done, if done in a way or manner that injuries, or damages, or otherwise violates the rights of another person with unnecessary harshness or severity, as by misuse or abuse of authority or power, or by taking advantage of some weakness, or disability, or misfortune of another person.

3 K. O'Malley, J. Grenig, *et al.*. Federal Jury Practice and Instructions § 128.81 (5th ed. 2000). The Sixth Circuit has approved of similar punitive damages instructions in the context of civil rights claims under 42 U.S.C. § 1983. *See Walker v. Norris*, 917 F.2d 1449, 1459 (6th Cir. 1990) (affirming instruction permitting award of punitive damages where the defendant's conduct was "maliciously, wantonly, or oppressively done").

The facts in this case do not permit a finding that Orlans or Deutsche Bank acted maliciously or oppressively in violating James Hurley's rights under the SCRA, as there is no evidence that Orlans or Deutsche Bank was motivated by ill will, spite, or grudge, or acted in an oppressive manner in committing the two SCRA violations identified in the March 13, 2009, Opinion. Whether Plaintiffs are entitled to punitive damages thus boils down to whether Defendants acted wantonly.

The Supreme Court has described "wanton" conduct as follows:

> "Wanton means reckless–without regard to the rights of others. . . . Wantonly means causelessly, without restraint, and in reckless disregard of the rights of others. Wantonness is defined as a licentious act of one man towards the person of another, without regard to his rights; it has also been defined as the conscious failure by one charged with a duty to exercise due care and diligence to prevent an injury after the discovery of the peril, or under circumstances where he is charged with a knowledge of such peril, and being conscious of the inevitable or probable results of such failure."

*Smith v. Wade*, 461 U.S. 30, 39 n.8, 103 S. Ct. 1625, 1631 n.8 (1983) (quoting 30 American and English Encyclopedia of Law 2-4 (2d ed. 1905) (footnotes omitted)). Employing this standard, the Court next examines the evidence pertaining to each Defendant's conduct.

### Orlans' Conduct

Orlans became involved with the mortgage loan in September 2004, several months after James Hurley initially defaulted, when Saxon retained it to initiate a foreclosure by advertisement, or a nonjudicial foreclosure. On September 4, 2004, Orlans initiated its foreclosure procedures by sending a foreclosure packet to James Hurley. (Def. Orlans' Mot. Partial Summ. J. Ex. 9.) The letter advised James Hurley that Orlans had been retained to foreclose the mortgage on the property located at 53107 59 ½ Street, Hartford, MI 49057 and provided a telephone number to contact for payoff or payment arrangements and a list of frequently asked questions about foreclosures. The packet also included a form entitled "Notice to Active Service Personnel and Their Dependents," which contained the following paragraph:

> Please be advised that you may be protected under the Soldiers' and Sailors' Civil Relief Act of 1940. If you, or a family member, is on active duty or have been called to active duty, and your name appears on this mortgage, you may qualify to have the legal action against you put on hold. If you, or a family member, is on active military duty, please advise our office immediately by returning this form and a copy of your orders.

(*Id.*). The form instructed the recipient to return it to "Orlans Associates, PC, P.O. Box 5041, Troy, MI 48007-5041." (*Id.*) James Hurley did not return the form to Orlans, nor did he ever contact Orlans. (James Hurley Dep. at 31-32, Def. Orlans' Mot. Partial Summ. J. Ex. 1.) In addition, there is no evidence that James Hurley's mother, Valla, who held a power of attorney from James, contacted Orlans. Although James, or someone on his behalf, signed the form on September 15, 2004, Valla faxed it to Saxon, rather than Orlans. (Def. Deutsche Bank's Evidentiary Submission Ex. 25.) There is no evidence that anyone – including James Hurley, Valla Hurley, or Deutsche Bank – sent the form to Orlans.

On September 14, 2004, Orlans caused the sheriff to post a foreclosure notice on the property, which contained the following warning: "THIS FIRM IS A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT. ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE. PLEASE CONTACT OUR OFFICE AT THE NUMBER BELOW IF YOU ARE IN ACTIVE MILITARY DUTY." (Def. Orlans' Mot. Partial Summ. J. Ex. 10.) Orlans also published notice of the sale in the Paw Paw, Michigan, *Courier-Leader*, running daily from September 10, 2004, through October 1, 2004. (Def. Orlans' Mot. Partial Summ. J. Ex. 11.) This notice, like the notice posted on the property, contained the same instruction for the mortgagor to contact Orlans if he or she was on active military duty. In addition, both notices identified October 14, 2004, as the date of the sheriff's sale.

Finally, after the publication period expired, Defendant Lohr, an Orlans employee, prepared a Sheriff's Deed for the Property and a standard non-military affidavit stating:

> that upon investigation he is informed and believes that none of the persons named in the notice attached to the sheriff's deed of mortgage foreclosure, nor any person upon whom they or any of them were dependent, were in the military service of the United States at the time of sale or for six months prior thereto.

(Def. Orlans' Mot. Partial Summ. J. Ex. 14.) In his deposition, Lohr testified that he could not recall specifically what he did as part of his investigation prior to signing the non-military affidavit, but his general practice was to review the notes in the file, information received from the lender, and information received from mortgagors, if they called. (Lohr Dep. at 68-69, Def. Orlans' Mot. Partial Summ. J. Ex. 15.)

The foregoing evidence fails to show that Orlans (and Lohr) acted wantonly with respect to James Hurley's SCRA rights in handling the foreclosure. Orlans made several efforts to ascertain whether James Hurley was engaged in military service, including sending a Notice instructing the recipient to return it to Orlans immediately if he or she was on active military duty. While James Hurley, or someone on his behalf, filled out the form, Valla Hurley returned it to Saxon, not Orlans.

Orlans had no reason to expect that James Hurley would ignore the explicit directions to return the Notice to Orlans, nor did it have any reason to believe that James Hurley had not received the Notice. Moreover, Orlans issued two notices instructing James Hurley to contact Orlans if he was on active military duty. While the record contains evidence showing that Deutsche Bank was aware of James Hurley's upcoming period of military service, nothing shows that Orlans had this information. Thus, there is no factual basis for a jury to conclude that Orlans (or Lohr) acted with reckless disregard to James Hurley's SCRA rights.

Plaintiffs point to the non-military affidavit that Lohr signed and Lohr's failure to do "a single thing to verify James Hurley's military status, active duty or otherwise," as proof that Orlans recklessly disregarded his SCRA rights. (Pl.'s Punitive Damages Submission at 3.) But this assertion mischaracterizes Lohr's testimony. Lohr did not testify that he did nothing to confirm James' Hurley's military status; rather, he testified that he could not recall specifically what he did before signing the non-military and that he could not recall specific procedures, other than looking at the notes on the matter or information from the client. (Lohr Dep. at 68-71.) Orlans has submitted affidavits from employees who were employed with Orlans during 2004, which confirm that investigations conducted prior to signing non-military affidavits generally rely upon information received from the mortgagor in response to the foreclosure packet or foreclosure notices, or from the client. (Carbon Aff. ¶¶12, 13; Isaacs Aff. ¶¶ 13, 14, Def. Orlans' Resp. to Pls.' Mot. to Strike Exs. A and B.) If Lohr relied on this information (or lack thereof) in preparing the affidavit – and there is no evidence that he did not – then his statement in the affidavit "that upon investigation he is informed and believes," was not false, misleading, or lacking in foundation.

Plaintiffs also cite evidence regarding events that transpired at the eviction proceedings in state court. The Court has already ruled that Defendants did not violate the SCRA in connection with the eviction. The eviction occurred many months after the foreclosure, and Plaintiffs fail to

explain how such after-the-fact evidence could have any bearing on Orlans' conduct during the foreclosure. This evidence is irrelevant.

Plaintiffs further contend that Orlans failed or refused to toll the redemption period and sold the property to a bona fide purchaser. The operative event that precluded the required tolling of the redemption period was the sale of the property to the bona fide purchaser on November 16, 2005. Orlans denies that it had any involvement with the property after the redemption proceeding, including the sale to the bona fide purchaser. While Plaintiffs allege that Orlans sold the property "with actual notice and knowledge" that James Hurley was on active duty in Iraq, (Pl.'s Punitive Damages Submission at 3), there is no evidence in the record even suggesting that Orlans was involved in the sale.[5]

Next, Plaintiffs cite Orlans' failures to train its employees on SCRA matters or to provide them access to SCRA courses and seminars, as well as its failure to adopt an SCRA policy, as proof that Orlans recklessly ignored James Hurley's SCRA rights. Plaintiffs also refer to the purported testimony of their standard of care expert, Cordell Jones, that if Lohr had simply looked at Saxon's file, he would have discovered James Hurley's military status.[6] This argument, and Plaintiffs' reliance upon a standard of care expert, is misplaced and irrelevant, because this is not a negligence or malpractice case. More importantly, mere negligence cannot support an award of punitive damages. *Smith v. Piedmont Aviation, Inc.*, 567 F.2d 290, 292 (5th Cir. 1978) ("[M]ere inadvertence

---

[5]Plaintiffs generally cite Orlans' and Lohr's responses to Plaintiffs' discovery requests as support for their assertion that Orlans sold the property, but they fail to cite any specific response, leaving it to the Court to comb through the entire document for some clue as to what might support this assertion. Although the Court is "not obligated to sift through the entire record to determine whether or not a material factual dispute exist[s]," *Walton v. Rite Aid of Ohio, Inc.*, No. 95-3036, 1996 WL 262978, at *2 (6th Cir. May 16, 1996) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989)), it reviewed the discovery responses and found nothing supporting this factual assertion.

[6]Plaintiffs' assertion that James Hurley's mortgage application and pay stubs would have disclosed his status as a member of the Michigan National Guard at the time he applied for his loan is irrelevant to whether he was entitled to SCRA protection at the time of the foreclosure and during the redemption period.

or even gross negligence will not suffice to support an award of punitive damages. The tort must be aggravated by evil motive, actual malice, deliberate violence or oppression." (internal quotation marks omitted)).

Finally, Plaintiffs point out that Orlans was named a defendant in a lawsuit in the Eastern District of Michigan, *West v. Fifth Third Mortgage Co.*, No. 2:10-CV-10081 (E.D. Mich. 2010), involving similar factual allegations and SCRA claims. Plaintiffs further note that *West* contradicts Orlans' claim in its brief in support of its Motion for Partial Summary Judgment that "Orlans Associates has never experienced a prior, or subsequent incident in which the system it utilized to detect military status failed to detect and protect the S.C.R.A. rights of a military member." (Def. Orlans' Br. Supp. Mot. Partial Summ. J. at 15.) The existence of another case involving similar facts, without more, is insufficient to support an award of punitive damages against Orlans in this case, given the absence of any evidence that Orlans recklessly ignored James Hurley's SCRA rights.

### *Deutsche Bank's Conduct*

Deutsche Bank cites three reasons why Plaintiffs cannot establish their claim for punitive damages. First, it contends that Saxon's procedure in 2004, which required borrowers seeking relief under the SCRA to submit their individual active duty orders to Saxon, was reasonable in light of both the language of § 516(a) of the SCRA and Saxon's need as a creditor to confirm active duty status. Second, it contends that Saxon's employees acted in good faith in implementing Saxon's SCRA policy requiring individual orders and in working to assist Valla Hurley in activating James Hurley's SCRA protections. Finally, it notes that it has adopted enhanced SCRA procedures to further ensure compliance with the SCRA and prevent similar incidents from occurring in the future.

Although the Court previously held that Deutsche Bank violated the SCRA because it had actual notice of James Hurley's upcoming period of active military service, the Court concludes that the evidence is insufficient to subject Deutsche Bank to an award of punitive damages.

## Pertinent Facts and Evidence

Pursuant to the loan agreement, James Hurley was required to make his monthly payment on the first of each month. His May 2004 payment, paid late on May 18, 2004, was his last. On July 6, 2004, Saxon sent James Hurley a Notice of Default. (Def. Deutsche Bank's Evidentiary Submission Ex. 9.) Around the same time, James Hurley was ordered by the Michigan Department of Military and Veterans Affairs to a period of temporary duty at Camp Roberts in California from July 21, 2004, through August 20, 2004.

Saxon's call log shows that after it sent the Notice of Default, Saxon representatives attempted to reach James Hurley at home and at his place of employment. (Def. Deutsche Bank's Evidentiary Submission Ex. 16.) In separate telephone conversations in July, Brandi Hurley and representatives of James Hurley's employer informed Saxon representatives that James Hurley was gone on active duty for thirty days. Subsequently, Star Schott, one of the Saxon employees working on the Hurley loan, noted in Saxon SCRA reports that James Hurley was entitled to SCRA protection from July 2004 to August 2004, to reflect his temporary active duty assignment in California. This conclusion was wrong. In fact, James Hurley was not entitled to SCRA protection for his temporary duty assignment because the Michigan orders for temporary duty were not "a call to active service authorized by the President or the Secretary of Defense for a period of more than 30 consecutive days." 50 U.S.C. App. § 511(2)(A)(ii). Nonetheless, after receiving his temporary duty orders, Saxon erroneously afforded him SCRA protections for that period of service. (Def. Deutsche Bank's Evidentiary Submission Exs. 17-19.)

Between the end of August 2004, and the October 14, 2004, sheriff's sale, the following events and exchanges occurred with regard to the property and James Hurley's SCRA rights.

- On August 31, 2004, Valla Hurley informed a Saxon representative that she had received a cash offer from a third party to purchase the property for

$90,000. The representative told Valla that the matter would be assigned to the workout department and gave her a fax number for that department. Valla then faxed Saxon a note containing the purchase offer. (Def. Deutsche Bank's Evidentiary Submission Ex. 16.) Saxon assigned the file to its workout department on September 2, 2004, and the workout department prepared a "ShortSale Analysis" to determine whether the sale would be preferable to foreclosure. That same day, Saxon referred the loan to Orlans to begin foreclosure proceedings.

- Stephanie Gales, an employee on the Saxon workout team reviewing the offer Valla had submitted (the "short sale"), left a message for Valla on September 10, and again on September 13, requesting additional information – a signed contract, estimated HUD closing cost statement, and a pre-qualification letter – that Saxon required in order to start the process of reviewing the short sale request. (*Id.*)

- On September 15, Valla faxed a handwritten note to Saxon stating that James "was activated 7-21-04 to 8-20-04 sent to California for special training he is now on stand down for 60 days and is to be deployed to Iraq." (Def. Deutsche Bank's Evidentiary Submission Ex. 25.) The fax also included a "Memorandum for Employers of Soldiers" signed by Captain James Jennette and dated September 12, 2004, stating "[s]oldiers of the Michigan Army National Guard's 1073rd Maintenance Company will be involuntarily ordered to active duty in support of Operation Iraqi Freedom on 30 October 2004 for an initial period of up to 18 months," as well as the Notice Orlans had sent to James as part of the foreclosure packet. (*Id.*)

- On September 16, Valla called Stephanie Gales about the status of the short sale offer. Gales told Valla that she had left a message for her on September 13 asking for additional information she needed in order to start the review process. Although Valla told Gales that she would fax the information to her, Valla never sent the information.

- Also on September 16, Gales received the documents Valla had faxed the previous day, September 15, and noted that the original orders were not included but that she would check with a "rep" to see if Captain Jennette's memorandum would suffice to activate SCRA procedures. (Def. Deutsche Bank's Evidentiary Submission Ex. 16.)

- On September 22, 2004, Star Schott, the "rep" referred to in the call log, sent an SCRA "Requirements Letter" to James Hurley requesting "a copy of Military Orders reflecting Active Duty date." (Def. Deutsche Bank's Evidentiary Submission Ex. 26.) Schott noted in Saxon's records: "Information rcvd is not call to active duty paper paperwork. Active duty papers state the individual being called to active [duty] and the date and period of duty." (Def. Deutsche Bank's Evidentiary Submission Ex. 19.)

- On September 27, Valla faxed Saxon a copy of James' previous temporary duty orders from his California assignment and advised that she would send his new orders the following Monday, October 4. The following day, a Saxon representative noted that she would forward a copy of the temporary orders to Schott, although she "was sure we can't activate until updated orders are rcvd." (Def. Deutsche Bank's Evidentiary Submission Ex. 16.)

- On October 4, Gales left a message for Valla, stating that she needed a copy the original orders but would forward Captain Jennette's memorandum to Schott to see if she could accept it to activate SCRA procedures. (*Id.*) Valla returned the call later that day, and Gales instructed Valla to speak with Captain Jennette and ask him to fax a letter to Saxon.

- On October 5, Schott entered a "VIP" code in the "Delinquent Counselor" and "FCL/BDR/REO Counselor" code fields in the Hurley loan database. (Def. Deutsche Bank's Evidentiary Submission Ex. 30.) Saxon's SCRA procedures in effect at the time instructed Saxon employees to enter the "VIP" code in the database after determining that the borrower qualified for SCRA relief. Under the policy, one of the requirements for qualification was receipt of the borrower's active duty orders. Schott testified that the VIP code alerts the foreclosure department that a loan is subject to SCRA relief and stops the foreclosure referral department. (Schott Dep. at 323-24, Def. Deutsche Bank's Evidentiary Submission Ex. 22.) Deutsche Bank states in its brief that a Saxon witness will testify that Schott's understanding of what the VIP code did in 2004 is inaccurate because it did not stop a foreclosure action already in progress. Regardless, it is undisputed that Saxon never advised Orlans of James Hurley's upcoming period of military duty.

- On October 12, two days before the sheriff's sale, Valla called Saxon to get the status of the file and was told that Saxon was still waiting on the letter from Captain Jennette. Valla confirmed that she would follow up with Captain Jennette. The Saxon representative (apparently Gales) told Valla to get the letter from Captain Jennette so that a hold could be placed on the Hurley account. (Def. Deutsche Bank's Evidentiary Submission Ex. 16.) Later that day, Captain Jennette sent a fax to Saxon that included the unit orders for the 1073rd Maintenance Company, ordering the unit and its members to active duty on October 30, 2004, in support of Operation Iraqi Freedom.

The record discloses no further communications between Valla and Saxon prior to the October 14 sheriff's sale.

### Saxon's SCRA Policy and State of the Law

Deutsche Bank states that Saxon never activated James Hurley's SCRA protections for his period of active duty in Iraq by, among other things, halting the foreclosure sale, because its policy

in 2004 was to require borrowers seeking SCRA relief to provide their individual active duty orders, which James Hurley never did. While acknowledging that this Court has held that this policy of requiring receipt of individual orders was erroneous, Deutsche Bank argues that, even so, it was reasonable and sound for a number of reasons.

First, it contends that individual orders are preferable over unit orders because unit orders do not identify the individual by name and do not contain any personal identifying information. It points out that while individual members are part of the unit, reliance on unit orders alone would not necessarily ensure accuracy because it is not uncommon for fewer than all members of a unit to be activated.

Second, it argues that its policy of requiring individual active duty orders was reasonable because it allowed Saxon to actually confirm the borrower's call to active duty, as a means to avoid potential fraud and identity theft.[7] Saxon points out that the Court's prior ruling – that under § 516(a) of the SCRA, the servicemember's rather than the creditor's receipt of the order triggers SCRA protections – implies that a creditor could be held liable for violating the SCRA without ever having received notice from the borrower that he or she was called to active duty. It notes that SCRA § 527, which provides for an interest rate reduction to 6%, requires the borrower to provide the creditor a copy of his or her orders in order to receive the reduction, but there is no comparable requirement in § 516(a). Saxon suggests that such omission was likely an oversight by Congress because the reasons for notice to a creditor are even more compelling in the case of a foreclosure.[8]

---

[7] Saxon also notes that in 2005, the Department of Defense implemented a website designed to provide creditors information about a borrower's active duty status. Obviously, this resource was not available to Saxon prior to the foreclosure in this case, and, as Saxon points out, it does not provide information concerning activation of units.

[8] Because there was ample evidence that Saxon was aware of James Hurley's upcoming period of active duty, the Court was not required to consider whether a creditor could be held strictly liable for an SCRA violation without notice. Although the need for notice to the creditor is obvious, it does not follow that the requirement for active duty orders is more compelling in the case of a foreclosure than an interest rate reduction  On the one hand, where a foreclosure is involved, the creditor need simply halt the nonjudicial foreclosure until confirmation of active duty status is obtained. Or, if the creditor prefers, it can continue the foreclosure through a court action. On the other hand, an interest rate reduction affects a creditor's contractual right to receive interest, so in those circumstances, the creditor has a greater need for the individual active duty order before taking action.

Finally, Saxon points out that § 516(a) does not distinguish between individual and unit orders, and prior to this Court's March 13, 2009, Opinion holding that unit orders suffice under § 516(a) to invoke SCRA protections, no court had addressed the issue. In fact, the Court's research at the time disclosed that no court had ever interpreted § 516(a).

The evidence discussed above shows that Deutsche Bank/Saxon did not act wantonly or with reckless disregard toward James Hurley's SCRA rights. In one sense, Saxon employees were even more protective of his rights than necessary when they erroneously assigned the loan SCRA status during his 30-day period of temporary duty in California. Even with regard to James Hurley's period of service that did qualify for SCRA protection, Saxon's employees made good faith efforts to activate those rights, even in spite of Saxon's policy (now determined to be erroneous), by accepting proof other than individual duty orders – Captain Jennette's memorandum – as sufficient to meet the policy and authorize input of the VIP code. Even though Schott entered the VIP code in the Hurley loan database, Saxon did not grant James Hurley SCRA relief (by ceasing the nonjudicial foreclosure and extending the redemption period) because he never provided a copy of his individual Iraq active duty orders, as Saxon's SCRA policy required. But this fact, alone, does not show that the Saxon employees were recklessly indifferent to James Hurley's rights.

With regard to the policy itself, Deutsche Bank/Saxon has articulated valid reasons why a creditor would want a copy of the borrower's individual orders before granting SCRA relief. The fact that Saxon's policy was not, in this Court's judgment, consistent with the SCRA, however, is not enough for a punitive damages award. In *Kolstad v. American Dental Association*, 527 U.S. 526, 119 S. Ct. 2118 (1999), the Supreme Court addressed punitive damage awards under the Civil Rights of 1991, 42 U.S.C. § 1981a(b)(1). The Court observed that in enacting § 1981a(b)(1), Congress looked to the Court's decision in *Smith v. Wade*, 461 U.S. 30, 103 S. Ct. 1625 (1983),

which held that punitive damages under § 1983 focus on the defendant's state of mind, requiring at least a showing of recklessness. *Id.* at 535-36, 119 S. Ct. 2124-25. Pertinent to this case, the Court stated:

> There will be circumstances where intentional discrimination does not give rise to punitive damages liability under this standard. In some instances, the employer may simply be unaware of the relevant federal prohibition. There will be cases, moreover, in which the employer discriminates with the distinct belief that its discrimination is lawful. The underlying theory of discrimination may be novel or otherwise poorly recognized, or an employer may reasonable believe that its discrimination satisfies a bona fide occupational qualification defense or other statutory exception to liability.

*Id.* at 536-37, 119 S. Ct. at 2125. Similarly, here, the fact that Saxon violated the SCRA does not give rise to punitive damages because § 516(a) of the SCRA was new and had not been previously construed by any court. Moreover, Saxon's belief that its policy was valid shows that it lacked the requisite state of mind for punitive damages. Finally, other than pointing to the SCRA violations themselves, Plaintiffs offer no specific evidence to demonstrate the requisite state of mind.

### 2. Orlans' Motion to Amend and Correct

Orlans has moved to amend its brief in support of its Motion for Partial Summary Judgment to delete its statement that it has never experienced another incident in which the system it uses to detect military status failed to detect and protect the rights of a member of the military. Orlans seeks to correct this statement in light of the *West* case that Plaintiffs cited. Because Plaintiffs have not responded to the motion, and the Court finds no reason to deny it, the motion will be granted.

### B. Plaintiffs' Motion

Plaintiffs combined their response to Orlans' Motion for Partial Summary Judgment with a Motion to Strike and Motion for Sanctions. As the Court understands it, Plaintiffs contend that Orlans' motion should be stricken because Orlans disregarded the August 12, 2010, Order by filing a motion for partial summary judgment rather than a motion to strike.

While Plaintiffs are correct that the August 12, 2010, order specified a motion to strike, the motion would have been more properly characterized as a motion for summary judgment because it allowed Defendants to file motions based upon the sufficiency of the evidence. Federal Rule of Civil Procedure 12(f) permits a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." The motion specified in the August 12, 2010, Order did not involve striking matters from pleadings, but rather was evidence-based; hence, a motion for summary judgment was the correct procedural vehicle for seeking a ruling on the sufficiency of the evidence supporting Plaintiffs' claim for punitive damages. Plaintiffs also contend that Orlans should be sanctioned because the grounds it raised in its motion went beyond the scope authorized by the August 12, 2010, Order. While the Court agrees that Orlans' motion exceeded the scope allowed by the August 12, 2010, Order, it concludes that sanctions are not warranted because Orlans may have reasonably, but mistakenly, interpreted the order as permitting its due process argument. Thus, the motion will be denied.

### III. CONCLUSION

For the foregoing reasons, the Court will deny Deutsche Bank's Motion to Strike Plaintiffs' Claim for Punitive Damages, as well as Plaintiffs' Motion to Strike and Motion for Sanctions. The Court will grant Orlans' Motion for Partial Summary Judgment and its Motion to Amend and Correct Prior Pleadings. Finally, the Court concludes that Plaintiffs' evidence is insufficient to support punitive damage awards against Defendants.

An Order consistent with this Opinion will be entered.

Dated: December 17, 2010          _____/s/ Gordon J. Quist_____
                                      GORDON J. QUIST
                              UNITED STATES DISTRICT JUDGE